## UNITED STATES v. HARNISH.

District Court, D. Maine, N. D.
June 11, 1934.

Hubert C. Thompson, of Boston, Mass., and Frank Powers, of Lewiston, Me., for plaintiff.

John D. Clifford, Jr., U. S. Atty., and William B. Nulty, Asst. U. S. Atty., both of Portland, Me.

PETERS, District Judge.

Upon a complaint by the United States alleging violation of the Radio Law, the defendant has been bound over to await the action of the grand jury at the present term of this court. Anticipating an indictment, he has filed two motions; one alleging an illegal search by federal officers of a dwelling occupied by him and the seizure of certain property there, the suppression of which as evidence is asked for; and the other asking for the return of the same property to his possession. The defendant claims that his constitutional rights under the Fourth and Fifth Amendments have been and may be violated.

On a hearing before me the following facts were developed:

During the period from the autumn of 1933 to March, 1934, when the search took place, federal officers engaged in enforcement of the tax laws became satisfied that a radio station somewhere near Ellsworth, Me., was being used to guide the movements of vessels engaged in smuggling merchandise into the United States. An expert radio technician among the officers succeeded in identifying the wave length, deciphered the code being used, and, by clever manipulation of a radio direction finder, after many experiments, on March 10, 1934, located the station as being in a certain garage building near the main street of the village of Brooklin, and through a window in the second story saw a person wearing headphones, apparently operating a radio set. Having made this observation the officers proceeded to Ellsworth and ascertained by long-distance telephone that no person in Brooklin had a license to operate a radio set as provided by law. Returning to Brooklin and to a point in the street opposite the garage, the direction finder disclosed the fact to the expert that the radio signals were being sent as before from within the building and by the same

hand that had been for some time sending them to vessels off the Coast. Looking through the window he and the other officers again saw a person with the headphones at his ears operating the set, the message from which to a vessel was being heard through the detecting instrument they were using. Rushing up a flight of stairs they seized the operator while transmitting the message, and without breaking the connection the government expert himself put on the headphones, continued the conversation with the vessel, imitating the style of the previous operator with which he had become familiar, told the vessel that orders had been changed, and directed her to come to a certain harbor at a certain time, at which place and time I understand she was seized by revenue officers conveniently awaiting her arrival, and is now held pending forfeiture proceedings of vessel and cargo of liquor.

The officers arrested the operator who gave the name of Hartman, but who is the defendant here, and who stated that he resided in Camden, Me., and was at the location of the radio set for the purpose of repairing it. He made no claim of even a temporary domicile in the rooms over the garage, and asserted no ownership or interest in the radio set therein, which was seized and removed and is now held as evidence in connection with the charge against the defendant.

The officers making the arrest and seizure had no warrant either to arrest or to search. There were two rooms over the garage, roughly adapted, one for sleeping and one for eating, with two beds in the room where the radio set was operated; a kitchen stove and some kitchen apparatus in the other. These rooms had been let by the month to the defendant by the owner of the premises in the latter part of 1933 for the ostensible purpose of headquarters while hunting in the vicinity, and the defendant had lived there during the winter, mixing some shooting with illegal use of the radio set.

The defendant contends that his constitutional rights have been violated in that his dwelling was entered and searched without a warrant, and that there was not sufficient ground for a claim that a crime was being committed in the presence of the officers justifying an arrest without a warrant. More specifically, he claims that the arrest was incidental to the search, that the officers were connected with the alcohol tax unit seeking evidence against a vessel and not primarily interested in enforcing the radio laws, and that when they entered the building it was for the purpose of obtaining such evidence. Also that to authorize an arrest for a crime being committed in their presence the officers must be in a position to know who was committing it; and in order to discover that, in this case, they had to make an illegal search, thus becoming trespassers and subject to the penalties for searching a dwelling without a warrant provided in title 18, § 53, U. S. Code (18 USCA § 53).

1. The officers, while specifically engaged in enforcing the revenue laws, were required to enforce all laws the violation of which came under their observation. I am not impressed with the theory that it makes any difference whether their original and predominant purpose was to enforce one law in preference to another. If they were justified in entering to make an arrest it is immaterial that other plans they may have had were thereby aided or other crimes disclosed.

2. It does not seem necessary to decide whether the place where the arrest and seizure were made comes under the general category of a dwelling house which cannot be searched without a warrant nor whether it was a "private dwelling" as described in the section of the statute claimed to have been violated. In any event, whether a dwelling or not, the search and seizure, if limited to the place where the arrest was made and to things connected with the crime, were authorized, provided the arrest was lawful.

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted. See Carroll v. United States, 267 U. S. 132, 158, 45 S. Ct. 280, 69 L. Ed. 543 [39 A. L. R. 790]; Weeks v. United States, 232 U. S. 383, 392, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177." Agnello v. United States, 269 U. S. 20, 30, 46 S. Ct. 4, 5, 70 L. Ed. 145, 51 A. L. R. 409; Marron v. U. S., 275 U. S. 192, 48 S. Ct. 74, 72 L. Ed. 231.

The search was made at the time of the arrest, was properly limited as to the place, and the only things seized were the radio set and a pistol.

3. Was the arrest a lawful one? That a felony was being committed in the building simultaneously with the presence of the officers outside cannot be questioned. Signals were being transmitted to a vessel from

an unlicensed station on shore, which is a crime of that grade under the Radio Act of 1927 (47 USCA § 81 et seq.).

That the crime was committed in the presence and to the knowledge of the officers seems to me to be equally clear. They heard the signals transmitted to the vessel; they saw the person doing it; they knew that the station was an outlaw one, as it had no license. To be sure, they heard through a mechanical apparatus; but that simply gave them more accurate information than their ears alone could receive. They had all the information they could have gained by being in the building, except knowledge of the personal appearance of the operator of the radio. Before they entered they knew through the sense of sight and hearing that some person was illegally operating a radio set. After entry they knew that it was a man who gave the name of Hartman, which turned out to be a fictitious name. It is not necessary to be informed of the identity of a person found committing a crime in order to legally arrest him. It was not necessary for the officers to go inside the building in order to determine whether a crime was being committed. Seeing and hearing and knowing what they did outside the building, it was their duty to enter at once and arrest the lawbreaker, whoever he was, and to seize as evidence the radio being used.

■ The search was made after the arrest and wholly incidental thereto. The situation here appears to be exactly parallel to that in the Agnello Case, supra. In that case the officers, anticipating a sale of narcotics in the dwelling house of Alba, stationed themselves outside. "Looking through the windows, those on watch saw Frank Agnello produce a number of small packages for delivery to Napolitano (the decoy) and saw the latter hand over money to Alba. Upon the apparent consummation of the sale, the agents rushed in and arrested all the defendants. They found some of the packages on the table where the transaction took place and found others in the pockets of Frank Agnello. All contained cocaine. On searching Alba, they found the money given him by Napolitano." The officers had no warrant. The Supreme Court said: "The legality of the arrests or of the searches and seizures made at the home of Alba is not questioned." And the court said further, "such searches and seizures naturally and usually appertain to and attend such arrests. But the right does not extend to other places." The search of Agnello's home on another street was held unlawful. No arrest was made there. The court said:

"Save in certain cases as incident to arrest, there is no sanction in the decisions of the courts, federal or state, for the search of a private dwelling house without a warrant."

The officers outside the house of Alba saw what, with their previous knowledge, they believed to be a violation of law. The officers outside the building in the instant case saw what, with their previous knowledge, they knew to be a violation of law.

The case of U. S. v. Chin On (D. C.) 297 F. 531, 533, was one where the officers had an invalid warrant to search a living apartment. They entered under the warrant and found the defendant smoking opium, whereupon he was arrested and opium and certain paraphernalia were discovered and seized. Judge Morton said that the fact that the officer supposed he was entering under a valid warrant did not diminish his other rights when the warrant turned out to be invalid.

"No search warrant is necessary in order to justify an officer in entering a building where he has reasonable ground to believe that a felony is being committed. Green v. State, 92 Tex. Cr. R. 151, 241 S. W. 1014. He may break doors to get in and apprehend the felon. Commonwealth v. Phelps, 209 Mass. 396, 95 N. E. 868, Ann. Cas. 1912B, 566; 2 Ruling Case Law, p. 476. The officer appears to have believed that a continuing felony, viz. the unlawful possession of smoking opium, was being committed in the rooms which he entered, and that he should find there one or more of the guilty persons. This justified his entrance." Pong Ying v. U. S. (C. C. A.) 66 F.(2d) 67.

■ 4. I am also of the opinion that the defendant is not in a position to invoke the protection of the Fourth and Fifth Amendments, for the reason that he has disclaimed any interest in the premises searched and the property seized. He told the officers at the time that he lived elsewhere, explaining his presence in Brooklin by saying he came to repair the radio set. According to the information given the officers by the defendant, their proceedings then and thereafter were not in violation of his rights.

■ The motion for a return alleges possession and not ownership. Mere physical custody of incriminating evidence is not enough to entitle one to invoke the protection of the amendment. U. S. v. Mandel (D. C.) 17 F. (2d) 270.

The proposition that one who disclaims any interest in the premises searched and the property seized cannot take advantage of an illegality of the search and seizure is sus-

tained by many cases, among others U. S. v. De Bousi (D. C.) 32 F.(2d) 902, and cases cited in that opinion. Kelley v. U. S. (C. C. A.) 61 F.(2d) 843, 86 A. L. R. 238.

The defendant's motions are denied, without prejudice, however, to their being renewed at the time of the trial.